RTP/FTB
F. #2016R00577

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

     - against -                                                    Docket No. <u>16–CR-396 (S-1) (ERK)</u>

WAFA ABBOUD,

           Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - X

## MEMORANDUM OF LAW IN OPPOSITION TO
## <u>DEFENDANT WAFA ABBOUD'S MOTION FOR A NEW TRIAL</u>

BREON PEACE
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Robert T. Polemeni
F. Turner Buford
Assistant U.S. Attorneys
     (Of Counsel)

TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................... 1

I.   Relevant Factual and Procedural ackground ...................................................... 3

     A.  The Trial Evidence Regarding the Defendant's Bank Fraud ................................. 3

     B.  The Trial Record Regarding the Decision to Admit Certain Facts and Ultimately
         Concede Guilt on the  Bank Fraud Counts ............................................................ 7

     C.  The Trial Record Regarding the Defendant's Decision Not To Testify .............. 11

     D.  Relevant Testimony at the Hearing .................................................................... 13

II.  Argument ............................................................................................................ 22

     A.  Trial Counsel Did Not Commit a Structural Error in Conceding Guilt to the Bank
         Fraud Counts Because the Defendant Had Agreed to the Strategy and Did Not
         Raise a Contemporaneous Objection.................................................................. 22

     B.  Trial Counsel Properly Advised the Defendant on the Question Whether to Testify
         in Her Own Defense and Did Not Prevent Her from Doing So Had She So
         Chosen ................................................................................................................ 26

     CONCLUSION........................................................................................................ 30

## PRELIMINARY STATEMENT

The government respectfully submits this brief in opposition to the defendant Wafa Abboud's motion for a new trial.  (ECF Document No. 202).[1]  The defendant argues that she is entitled to a new trial on all counts because of two "structural errors" purportedly committed by trial counsel.  First, she claims that trial counsel violated her "right to autonomy" under the Sixth Amendment "to maintain her innocence" when trial counsel conceded her guilt to Counts Five and Six of the superseding indictment (the counts charging conspiracy to commit bank fraud and bank fraud) (the "Bank Fraud Counts") without her consent.  (Def. Mot. at 10).  Second, she contends that trial counsel "prevented her from testifying on her own behalf, as was clearly her right, despite [her] expressly stating to counsel she wished to testify."  (Id. at 13).  The defendant submitted a declaration in support of her motion (ECF Document No. 202-1); and the Court held an evidentiary hearing on the defendant's claims on March 31, 2022 (the "Hearing"), at which the defendant and the two attorneys who represented her at trial testified.

The defendant cannot prevail on either of her claims because both are squarely at odds with the facts, as established at trial and the Hearing.  At the Hearing, trial counsel both testified that they discussed with the defendant the planned concession to the Bank Fraud Counts before and during the trial, and that the defendant agreed with the strategy (or,

---

[1]    On July 9, 2019, following a jury trial, the defendant was convicted of all counts of the superseding indictment charging her with two counts of conspiracy to steal federal program funds, in violation of 18 U.S.C. § 371 (Counts One and Three); two counts of embezzling federal program funds, in violation of 18 U.S.C. § 666 (Counts Two and Four); conspiracy to commit bank fraud, in violation of 18 U.S.C. § 1349 (Count Five); bank fraud, in violation of 18 U.S.C. § 1344 (Count Six); and money laundering, in violation of 18 U.S.C. § 1957 (Count Seven).

at a minimum, voiced no objection).  Their testimony is corroborated by the trial record, which shows that the concession to the Bank Fraud Counts was previewed for the Court prior to the start of trial and discussed repeatedly in filings and in on-the-record colloquies between defense counsel and the Court that were conducted in the defendant's presence – all without objection from the defendant.

Similarly, trial counsel  – both of whom are experienced members of this Court's Criminal Justice Act panel – testified that they explained to the defendant her right to testify, conveyed to the defendant that the decision to testify was ultimately hers, and advised her (after giving the matter serious consideration) not to testify.  Their testimony is corroborated by two contemporaneous communications they sent to the government during trial, which demonstrate that the day before the close of evidence and summations trial counsel informed the government that the defendant had decided not to testify, but that she retained the right to change her mind and take the stand contrary to their advice and expectation.  The defendant's self-serving testimony in support of her motion that her will was overborn by counsel and that she failed to realize that her opportunity to testify had come and gone until after closing arguments were well under way is simply not credible.

Trial counsel and defendants must make difficult choices before and during trial.  Here, the record is clear that trial counsel and the defendant spoke on numerous occasions about whether the defendant should concede her guilt to the Bank Fraud Counts as part of a broader strategy to maintain credibility with the jury and possibly be acquitted on what trial counsel viewed as the more serious embezzlement charges.  Similarly, trial counsel and the defendant spoke numerous times about whether the defendant should testify in her defense, a tactic that trial counsel strongly advised against.  Based on those conversations,

the defendant chose to concede her guilt to the Bank Fraud Counts and chose not to testify in her own defense. At the end of the trial, after seeing and hearing the overwhelming evidence of her guilt, and after absorbing the arguments made during the parties' summations, the defendant came to regret her choices. Her regret, however, does not entitle her to a new trial.

Accordingly, the defendant's motion should be denied.

I.    RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

A.    The Trial Evidence Regarding the Defendant's Bank Fraud

The evidence introduced during trial established that the defendant and two co-defendants, Marcelle Bailey[2] and Rami Taha,[3] conspired to execute and did, in fact, execute, three fraudulent schemes. All of these schemes related to the diversion of federal program funds belonging to Human First Inc. ("Human First"), a not-for-profit entity that provided residential, educational and training services to developmentally disabled individuals, to the defendant, who used the stolen funds to fund her lavish lifestyle. The first scheme, charged in Counts One and Two of the superseding indictment, centered on a conspiracy between the defendant, Human First's executive director, and Bailey to divert Human First funds into bank accounts that Bailey and the defendant controlled. The defendant then used these funds to pay for hundreds of thousands of dollars in personal expenses.

---

[2]    Bailey pleaded guilty to Counts One, Two, Five, and Six; on August 25, 2021, the Court sentenced her to 33 months' imprisonment and ordered her to pay more than $1.3 million in restitution to Human First.

[3]    Taha pleaded guilty to Count Four on May 13, 2019, and is awaiting sentencing.

3

The second scheme involved a conspiracy between the defendant and Taha to embezzle Human First funds and divert the funds through bank accounts controlled by Taha; the defendant then used the embezzled funds to make a down payment on, and to make renovations to, a $1.3 million residence (the "Merrick Avenue Residence").

As most relevant here, a third scheme, charged in the Bank Fraud Counts, involved a conspiracy between the defendant, Bailey and Taha to misrepresent the source of funds that the defendant used toward the purchase of the Merrick Avenue Residence so as to conceal from the defendant's mortgage lender that the funds had been embezzled from Human First.  When New Penn Financial ("New Penn"), the mortgage lender from which the defendant secured a $1,000,000 loan to purchase the Merrick Avenue Residence, inquired as to the source of the funds that the defendant used for her down payment, the defendant, Bailey and Taha made several misrepresentations to New Penn in order to conceal the illicit nature of the funds.

For example, to conceal the fact that the defendant and Bailey had stolen $37,000 of Human First's funds that the defendant then used toward her purchase of the Merrick Avenue Residence, the defendant and Bailey signed and submitted a "Gift Letter" to New Penn, in which they falsely represented that they were cousins, that the funds were a gift from Bailey to be used by the defendant to purchase the Merrick Avenue Residence, and that there was no expectation of repayment.  The defendant and Taha signed a similar letter for a "gift" in the amount of $30,000, representing that Taha and the defendant were cousins. At trial, Dana Boon – an employee of New Penn – testified that if New Penn had known that Bailey and Taha were not in fact cousins of the defendant, then these "gifts" would not have been eligible for consideration as assets of the defendant – a result that would have affected

New Penn's decision whether to approve the mortgage to the defendant.  (Trial Tr. at 429-33;
GX304 at 77, 214-15, 219-20).

The evidence also showed that the defendant embezzled money directly from
Human First to inflate her personal finances for the sake of obtaining the mortgage.  For
example, the defendant received two different checks from "BAS Renovation Corp."
("BAS") in July 2014 – one for $50,000 and one for $120,000 – that were supposedly
payment for a "settlement" entered into between the defendant and BAS for "damages" that
BAS had purportedly caused to the defendant's prior residence.  (GX304 at 392-93).  A fake
agreement documenting the settlement was prepared on the letterhead of AZ Consultants
Corp. (Taha's company) and submitted to New Penn along with copies of the checks to
substantiate the source of the funds in support of the defendant's mortgage application.
(Trial Tr. at 433-438).

The trial evidence showed that the BAS checks were in fact Human First funds
initially paid out by the defendant on behalf of Human First to construction contractors and
then swiftly routed through the bank accounts of various entities – including those of BAS –
before being deposited directly into the defendant's personal account.  (GX143 – summary
chart).  The jury also heard testimony from Pawel Bak, a contractor who had in fact
performed renovations on the defendant's prior residence, that he was unaware of BAS and
that, to his knowledge, no such entity had done any work on the property.  (Trial Tr. at 743-
44).[4]  Dana Boon testified that if New Penn had known the true origin of the funds, it would

---

[4]     The jury also heard testimony regarding activity in BAS's bank accounts
around the time the checks were issued to the defendant that was inconsistent with the
expected financial activity of a construction contractor, including multiple small-dollar-

have affected the decision whether to approve the defendant's mortgage.  (Trial Tr. at 437-38).

The jury also heard evidence that soon after being advised that her mortgage application would be denied due to an unacceptable debt-to-income ratio, the defendant unilaterally and fraudulently increased her salary, in effect stealing additional funds from Human First.  The evidence showed that the denial of the mortgage application was issued on or about October 20, 2014.  (GX302 at 50).  The defendant's bank account records reflect that she was receiving around this time a paycheck from Human First via direct deposit every two weeks in the amount of $15,517.46.  (GX111-02, at 383).  Her bank records show that on October 27, 2014, she received a deposit of $17,395.34 in the form of a manual check from Human first and thereafter received direct deposits from Human First in that amount.  (Id. at 383, 392, 405; GX304 at 312).[5]  Meanwhile, Marcelle Bailey, at the defendant's request, authored a letter that was subsequently provided to New Penn falsely explaining that the defendant's annual salary had been increased effective July 2014 to $479,000, even though no such increase had been approved by Human First's Board of Directors.  (GX304 at 508; Trial Tr. at 361).  Dana Boon testified that – absent this salary increase – the defendant

---

amount purchases at Publix Supermarkets and liquor stores in West Palm Beach, Florida. (Trial Tr. at 987; GX122-02, at 63).

[5]    Moataz Ramadan, Human First's assistant controller, testified that he recalled being asked to step into a meeting among Belgica Carbonara (Human First's CFO), Marcelle Bailey, and another Human First employee, where he was asked how to run an out-of-sequence paycheck, and he explained the process for how it could be done.  (Trial Tr. at 128-30).  He also testified that the defendant was walking in and out of the meeting, while speaking on her cell phone.  (Id.).

would not have qualified for the mortgage loan that was ultimately approved by New Penn. (Trial Tr. at 418-427).

    In addition, the evidence showed that the defendant had secretly obtained a second mortgage on the property (from the sellers of the Merrick Avenue Residence) simultaneously with securing the mortgage loan from New Penn.  The terms of this second mortgage were contained in a document signed by the defendant on December 8, 2014 (the same date as the closing for the defendant's purchase of the Merrick Avenue Residence). (Trial Tr. at 442).  The document was recorded in the county clerk's office and reflected that the second mortgage was for $300,000.  (GX94 – stipulation; GX306 – mortgage).  The defendant deliberately chose not to disclose this second mortgage to New Penn, instead signing multiple documents falsely attesting to the fact that she had no additional debt beyond what she had disclosed at the time of the closing.  (Trial Tr. at 438-445).  Dana Boon of New Penn testified that – had New Penn been aware of this $300,000 second mortgage – they would not have approved the $1,000,000 loan the defendant received.  (Id.).

  B.  <u>The Trial Record Regarding the Decision to Admit Certain Facts and Ultimately Concede Guilt on the Bank Fraud Counts</u>

    On June 22, 2019, a few days prior to the start of trial, trial counsel filed a motion <u>in</u> <u>limine</u> seeking to preclude the government from introducing the evidence described above showing that the defendant fraudulently increased her compensation to help secure the mortgage loan used to purchase the Merrick Avenue Residence.  In the motion, trial counsel argued that the probative value of the evidence would be minimal with respect to the Bank Fraud Counts because, among other reasons, the defendant would not dispute that documents that she had submitted to New Penn to obtain the loan were false:

> [a]s will be evident during the defense opening statement, Ms.
> Abboud will acknowledge that the "gift letters" and the
> "settlement agreement" [with BAS] were false and were
> prepared and submitted for the purpose of obtaining the
> mortgage.  Further she will also not dispute that an additional
> note and mortgage in favor of the sellers for $300,000 was
> executed by her and the sellers.

(ECF Document No. 135, at 4-5).

Then, prior to opening statements on June 26, 2019, and in the defendant's

presence,[6] the Court heard preliminary arguments pertaining to the defense's motion.  During

the colloquy, trial counsel reiterated that the defendant would not dispute that she had

submitted false information to New Penn in order to obtain the mortgage, making the

following argument:

> If it's part of the mortgage fraud, I do understand that theory
> that the government is presenting, so she can present a higher
> income to the mortgage fraud.  As I said in our papers, we're not
> challenging the issues, the facts relating to the providing false
> information to the mortgage company to obtain the mortgage.
> So therefore, it's not particularly probative.

(Trial Tr. at 5).

Trial began later that morning.  In the defense's opening statement, trial

counsel did what they had told the Court they were going to do, that is, trial counsel

conceded certain facts relating to the Bank Fraud Counts, including that the defendant had

lied to New Penn:

> Throughout this trial we are not going to disagree or try to
> contradict many of the facts that the Government are trying to
> prove.  In fact, we will agree to some of the bad acts that Ms.
> Abboud has done. . . .  Now I want to tell you a couple of things

---

[6] During the Hearing, the defendant testified that she paid close attention to the
proceedings at trial.  (Hr. Tr. 17).

> up front.  Ms Abboud lied about her relationship with Ms.
> Bailey and Mr. Rami Taha and she lied about whether the loan
> was really a gift and about the existence of another deal.  We
> won't contest that she was dishonest, because she was.

(Tr. 25-26).

On July 1, the government renewed its motion that it be permitted to introduce certain evidence regarding the defendant's fraudulent efforts to obtain Hurricane Sandy relief funds, a motion that had been previously denied by Judge Vitaliano prior to trial.  (ECF Document No. 141).  The government sought to introduce documentary evidence indicating that the defendant had asked Taha to create the fraudulent AZ Consultants invoices falsely indicating that the defendant had paid for contracting work that had been done to her prior residence, evidence that would rebut the defendant's argument that trial counsel had made in its opening statement that the defendant was not aware of Taha's criminal conduct.  Trial counsel opposed the motion, arguing that the Court should abide by Judge Vitaliano's prior resolution of the issue, contending that no new circumstances required a revisitation of that ruling precluding the proffered evidence.  Specifically, trial counsel emphasized that the Court should not reconsider Judge Vitaliano's decision to preclude the evidence because the defendant was going to concede guilt to the Bank Fraud Counts:

> Further, at the time that Judge Vitaliano rendered his decision, it
> was not known to him that Ms. Abboud would admit to the
> mortgage fraud counts, further diminishing the probative value
> of the evidence but not the unfair prejudice that would ensue.

(ECF Document No. 143, at 2, emphasis added).

In an oral argument on the motion held later during the trial day, trial counsel reiterated on the record (in the presence of the defendant) that the defendant would admit her guilt to the Bank Fraud Counts:

| COURT: | I don't understand.  I'm just curious.  The last paragraph [of the defense's opposition to the government's motion in limine] says, "Further, at the time Judge Vitaliano rendered his decision, it was not known that Ms. Abboud would admit to the mortgage fraud counts." |
|---|---|
| COUNSEL: | That's correct. |
| COURT: | She has admitted to it. |
| COUNSEL: | We have admitted to the, most of the facts of the mortgage count and we're going to admit to the guilt of the mortgage count during closing arguments. |
| COURT: | Which counts are they? |
| GOVERNMENT: | Those are Five and Six, separate and apart from any charge of embezzlement which is these documents that we seek to admit and this chronology really goes to. |
| COUNSEL: | Your Honor, I included in that the money from Mr. Taha, you know, and the money from BAS Renovation that is already related to Mr. Taha as shown by the government.  So in admitting to that count, we're admitting to Mr. Taha's involvement in that and Ms. Abboud receiving a benefit from it.  So it's not – so we are not going to get up and say that Ms. Abboud knew nothing of Mr. Taha's criminality.  We might not get up and say that she did but we're certainly not going to deny it.  So the government, you know claim of a change, you know of us opening the door really does not exist. |

(Tr. 1058).  The Court granted the government's motion.

Then, during closing arguments, in the face of the overwhelming evidence of the defendant's guilt on the Bank Fraud Counts, trial counsel again did what they told the Court they were going to do, that is, they conceded the defendant's guilt to the Bank Fraud Counts:

His honor is going to instruct you at the end of the case. One of
the things that he's going to tell you is that sentencing, what and
how Ms. Abboud gets sentenced, is up to him. You have
nothing to do with that. But I don't think I'd go out on a limb to
say what you do have something to do with is what she gets
sentenced for. <u>Because we have explained to you in the
beginning of the case that Ms. Abboud committed the offense of
mortgage fraud or bank fraud in supplying documents that were
not accurate to New Penn in order for her to get a mortgage.
She will get punished for that. His Honor will decide. And the
charges related to that, we are not asking you to say she's not
guilty. She should get punished for what she did.</u>

(Tr. 1232-33, emphasis added). And later, trial counsel argued:

<u>She committed fraud with the mortgage people.</u> She tried to get
a fake W-2. It maybe wrong, but that's not what she is charged
with here [meaning the counts related to embezzlement]. . . . If
you go back and say that oh, she did this mortgage fraud, oh,
she tried to get more money out of a program for Hurricane
Sandy, therefore, we don't care, we don't have to examine the
other evidence, you're not doing your job. That's not doing
your job. You need to look at this particular case. (<u>Id.</u> at 1265,
emphasis added).

(Tr. 1265-66, emphasis added).

C.      <u>The Trial Record Regarding the Defendant's Decision Not To Testify</u>

At various times during trial, the issue of whether the defendant would testify

was the subject of on-the-record discussion among the Court and the parties. On June 27, the

Court inquired of the parties as to the progress of the trial and how many witnesses remained.

Trial counsel indicated that it might call one witness and went on to say: "And Ms. Abboud

may be testifying. She'll be a much longer witness if she testifies." (Trial Tr. at 473). The

Court replied "Okay. Nine out of ten times when I am told that a defendant might be

testifying, they don't. But it doesn't matter; if she testifies, she testifies." (<u>Id.</u>). Trial

11

counsel then said "Judge, every time the next time it seems to be it happens.  So we don't

know."  (Id.).  The Court responded: "Oh, I know it happens."  (Id.).

On June 28, the Court and parties again discussed the anticipated duration of

the trial into the following week.  Trial counsel said regarding the possibility of a defense

case: "My guess is that if Ms. Abboud does not testify we'll take, at most, a couple of hours.

If Ms. Abboud testifies, clearly we're going to run into the following week."  (Id. at 721).

On July 2, at the conclusion of the trial day, there was another colloquy

concerning the anticipated length of the trial.  Defense counsel said: "I indicated to the

Government that I would let them know sometime over the weekend whether Ms. Abboud is

testifying or not.  So they would know that they don't have to spend any time preparing for

that."  (Id. at 947).  The Court remarked: "I would be very surprised if she's going to testify,

but I have occasionally been surprised of things that happen here."  (Id. at 948).

The following day, July 8, the government concluded its evidentiary

presentation and rested.  Trial counsel called two witnesses.  Prior to the lunch break, the

Court addressed the attorneys and inquired of trial counsel: "Are you finished with

witnesses"?  (Id. at 1166).  Counsel responded: "With witnesses.  We have stipulations to put

in, and I guess there is something, the rest of the 990s that will be put in by consent and I

think that's it."  (Id.).  The Court then took a lunch break for approximately one hour and ten

minutes.  (Id. at 1169).  After lunch, the defense introduced certain stipulations and then

rested.  (Id. at 1172).  The Court proceeded directly to summations.  (Id.).  After the

government's summation, a ten-minute recess was taken before the defense summation

began.  (Id. at 1230-31).  Following the defense summation, another brief recess was taken

prior to the government's rebuttal argument.

The following morning, the defendant filed a pro se letter with the Court (ECF No. 145) claiming that she had been "misrepresented" at trial because she had not agreed to admit her guilt to the Bank Fraud Counts and that trial counsel had prevented her from testifying.

D.    Relevant Testimony at the Hearing

At the Hearing, the defendant testified that trial counsel had not made her aware of the decision to concede guilt on the Bank Fraud Counts until "two minutes before the opening statement." (Hr. Tr. 7). She testified that she had authorized trial counsel to concede guilt to the Bank Fraud Counts only as part of pretrial plea negotiations – not as a matter of trial strategy. (Id.). She further testified that trial counsel did not advise her that they intended to concede guilt to the Bank Fraud Counts in closing arguments. (Id.).

With regard to her claim that she was not permitted to testify in her own defense, the defendant testified that she had discussed the matter with trial counsel as early as six months prior to the start of trial and had engaged in multiple discussions after that, including at least one session that featured mock questions and answers to prepare for testimony. (Hr. Tr. 8). The defendant testified that it was her understanding from these discussions that trial counsel intended to call her to testify and advised her that certain pieces of evidence that she had wanted to feature during the trial would have to wait until she testified. (Id.).

The defendant testified that she had a meeting with trial counsel the weekend before the end of the trial that was "extremely tense" and "heated." (Id. at 9). According to the defendant, she told trial counsel that she wanted to testify in a way that was "absolutely unequivocal." (Id. at 21). The defendant further testified that trial counsel advised her not

13

to testify (explaining that testifying would be "legal suicide") and told her that they would make the points she wanted to make in her testimony during the defense summation.  (Id. at 9, 23).  Trial counsel also told the defendant that the Court would ask her at some point if she wanted to testify and, if she did, she could advise the Court of her decision at that point.  (Id. at 9-10, 23, 25).

        She testified that trial counsel had told her that when the Court asked if she wanted to testify, she "could make her decision then."  (Id. at 27).  According to the defendant, trial counsel further advised her that if she decided to testify, they would ask her questions in such a way as to undermine her credibility – in the defendant's words, they told her they were "going to keep saying what's next, what's next . . . and the jury and the judge will figure out we're not supporting you."  (Id. at 27).  The defendant testified that – when the Court did not inquire as to whether she wished to testify – she did not speak up before summations because she was "shocked and devastated" because she believed that her case could not be "rested" prior to her testimony.  (Id. at 11, 28).

        On cross examination, the defendant acknowledged that she was a graduate of Cairo University; had attended New York University, from which she received a business certificate; and had also attended Harvard Business School, from which she received the equivalent of an Executive Master's Degree.  (Hr. Tr. at 11-12).  She testified that she had overseen Human First, which had a staff of almost 500 employees and a budget of over $20 million.  (Id. at 12-13).  She testified that she had traveled to Albany, New York to meet with senior government officials to advocate for her constituents.  (Id. at 13).

        The defendant also testified that she had been involved in civil litigation prior to her federal criminal trial, including hiring an attorney to sue Human First for unpaid

vacation benefits after her termination and engaging an attorney to file, on a contingent-fee basis, a lawsuit in this district seeking Social Security benefits on her behalf.  (Id. at 14).  She also testified that she had been the defendant in a criminal trial in New York State court on certain tax charges in 2018.[7]  She testified that counsel who represented her at that trial advised her not to testify and that she had followed that advice and had chosen to not testify because she was waiting to testify at her federal trial:

> Q:      You had the opportunity to testify during that trial, right, in your own behalf?
>
> A:      I choose not in that trial.  May I say why?
>
> Q:      Certainly.
>
> A:      Because what happened it was prior to this trial.  So basically they were charging me taxes as if I'm convicted for this trial.  Okay?  And I couldn't – the advice of my lawyers at that time if I have took the stand and defend myself and to the for this – it's almost the same trial, okay?  If I defend myself there, it will jeopardize my defense here.  And they told me that I needed to actually wait and then finish for that trial and then I can go and bill the tax case.  So it was like backwards.  Can I say something else?
>
> Q:      Certainly.
>
> A:      There was a private lawyer prior to court appointed lawyer for this case and the federal and he told me that it's absolutely illegal to have the state trial before the federal trial because they cannot charge you taxes for something they didn't confirm what they didn't prove that you got taxable income.  So it was kind of confusing after but it was my choice not to testify.  I was waiting to testify here.
>
> Q:      So you spoke with your state court attorney.  Was it a he or a she?

_____

[7]      The defendant testified that she thought the trial took place at the end of 2016, but in fact the trial occurred in March 2018 – a little over a year before her trial in this Court.

A:      He.

Q:      And you spoke with him and discussed your testifying at that
        trial.

A:      Yes.

Q:      And you decided – it seems that he recommended that you not
        testify.

A:      He gave me the choice.  And also at that time –

Q:      Gave you the choice?

A:      He gave me the choice.

Q:      But you chose not to.

A:      And at that time also I had a federal attorney and that attorney
        actually advised against it, so I listen to the attorneys that
        advised against it.  The only reason I listened is because this
        case was going on and I was waiting to come here for the trial
        here.  So it was conscious choice.  I had a choice and I choose
        the state one because there is a bigger picture.  So that's why.

Q:      It was your choice?

A:      Yes, sir.

(Hr. Tr. at 15-17).

       At the Hearing, trial counsel, Sam Schmidt and Andrew Bernstein, also

testified.  Mr. Schmidt, who testified that he had been the defendant's attorney in this matter

for approximately two years prior to the start of trial, explained the decision to concede guilt

to the Bank Fraud Counts and his discussions with the defendant about it:

        [I]n preparing the opening statements and how we're going to
        conduct the case, we sat down and talked to our client on a
        number of occasions.  Which particular occasion we discussed
        specifically about what we're going to do on the bank fraud
        count, I can't say which day it was, but we had a number of

16

> conversations of how we're going to defend it and whether or
> not it was a good idea to make arguments that flew in the face of
> the obvious facts.  Part of that was also that if Ms. Abboud was
> going to testify and that we knew that she would have to admit
> that the people who signed the letters were not her cousins, she
> would have to admit that the money from the real estate firm
> wasn't a settlement, the construction firm wasn't a settlement.
> So we knew that should she testify she was not going to
> contradict that.  So we had to accept that part of it. And at the
> point where the evidence came in that made it even more
> difficult to make challenges to that count, when we discussed it
> during the trial, it became clear that we were going to have to
> concede that count for the purposes of maintaining our
> credibility.  That would have occurred probably the second to
> the last weekend or during the week leading up to the
> completion of the government's case.

(Hr. Tr. at 51-52).

Mr. Schmidt went on to testify, in response to questions from the Court, that
while he did not recall asking the defendant explicitly whether she agreed with the plan to
concede guilt to the Bank Fraud Counts explicitly in closing arguments, he did clearly
explain to the defendant that it was his intention to do so and that the defendant "in some
manner indicated that she understood it . . . ."  (Hr. Tr. at 52-53).  He further testified that he
"certainly [knew] that [the defendant] did not say that she didn't want us to do that."  (Id. at
53).  He also testified that he would not have made the concessions in the opening statement
if he did not believe he had the defendant's consent and that the concessions had been the
subject of "long discussions . . . , including for example, the guidelines that would result in
the mortgage conviction versus the guidelines for the other counts."  (Id. at 56).

On the concession of guilt to the Bank Fraud Counts, Mr. Bernstein testified
that:

> So the strategy was during my opening was going to concede
> certain facts to maintain as much credibility as possible and see

17

> how the evidence came in and we would adjust that theory
> based on how the evidence came in.

(Hr. Tr. at 65).  Mr. Bernstein testified that he was in regular communication with the

defendant regarding strategy in the months and weeks leading up to the start of trial and that

she had agreed with the decision to concede guilt to the Bank Fraud Counts:

> Q:     At some point during the course of the trial did the strategy with
>        respect to the bank fraud counts change?
>
> A:     Yes.  So as the evidence came in, obviously strategy changes all
>        the time, we – while it was Mr. Schmidt's summation, we
>        worked very closely on it and a lot of discussion throughout the
>        trial and the strategy was based on the evidence and that we
>        wanted to have a chance at getting as many not guilty verdicts
>        as we can that we thought would be the most credible thing to
>        say to concede these counts but the government has not proven
>        the other counts.
>
> Q:     Did you discuss that change in strategy with the defendant?
>
> A:     Yes, we did.
>
> Q:     Did she agree with the change in strategy?
>
> A:     Yes.
>
> Q:     And just to be specific, did you discuss with the defendant that
>        Mr. Schmidt would essentially concede guilt to the mortgage
>        fraud counts at closing argument?
>
> A:     Yes.
>
> Q:     Did she agree with that approach?
>
> A:     Yes.
>
> Q:     You asked her explicitly whether she agreed?
>
> A:     Yes.  We had numerous conversations throughout the process.
>        They were at times heated, they were at times difficult, but we
>        had these conversations.

18

Q:      And you asked her explicitly, you told her we're going to
        concede guilt for the mortgage fraud counts and you said, I'm
        just saying in substance, and substance she said yes, it's okay?

A:      Yes.

(Hr. Tr. at 66-68).

On the question whether the defendant should testify in her own defense,
Messrs. Schmidt and Bernstein both testified that they (principally Mr. Bernstein) had
prepared the defendant to testify prior to the start of trial and that, as of the start of trial, no
final decisions had been made as to whether the defendant would in fact testify.  (Hr. Tr. 53-
54, 70-71).  Both attorneys testified that they had communicated to the defendant that the
final decision whether to testify was hers.  (Id.).  Both attorneys also testified that, as the trial
progressed and the evidence came in, they had concluded that it would be contrary to the
defendant's interests to testify in her own defense and communicated that advice to the
defendant.

Mc. Schmidt testified that over the weekend before the trial concluded, he met
with the defendant and explained why he thought she should not testify:

> There were two aspects of that.  One was some of the things that
> she really wanted to place in front of the jury we were able to
> get out through other means.  The second was that some of the
> things she continued to say that she would testify to few in the
> face of what I believed was the indisputable evidence.  Some of
> the things even she would testify to contradicted some of the
> things we made in our opening statement or the thrust of our
> defense which would make it very difficult for a jury to accept
> her testimony as accurate.  And so I felt, both myself and Mr.
> Bernstein felt very strongly that her testifying would do much
> more damage than allowing us to sum up on the existing
> evidence.

19

(Hr. Tr. at 55-56).  Mr. Schmidt testified that at the conclusion of the meeting the defendant agreed with the advice not to testify.  (Id. at 56, 61).  Mr. Schmidt testified that this was not necessarily the last word on the issue, however, because there was still a chance that the defendant would change her mind; but he testified that the defendant never communicated to him that she had changed her mind about testifying.  (Id. at 56, 59-60).  He also testified that he never told the defendant he would not permit her to testify, saying "I would never do that."  (Id. at 59).

Mr. Bernstein similarly testified that over the weekend before the end of the trial, he and Mr. Schmidt met with the defendant and advised her not to testify and that, while there was some back and forth on the issue, the defendant ultimately agreed that she would not testify.  (Hr. Tr. at 73).  He testified that he advised the defendant not to testify in part because of concerns regarding statements the defendant had made previously to the government during proffer meetings that were inconsistent with what he understood her to want to say in her trial testimony.  (Id. at 73-74).  He confirmed that he advised the defendant that the final decision whether to testify was hers to make, and he also testified that he did not tell the defendant that, if she elected to testify, he would ask the questions in such a way as to undermine her credibility.  (Id. at 74).

He did describe discussing with the defendant that – to avoid her potentially perjuring herself – her direct examination might have to "skip some topics" and that the "skipping of topics would probably be obvious."  (Id. at 82).  He also testified that he told the defendant that some attorneys – when they believe the client is committing perjury – will ask questions in an "unpersuasive" way – "what happened next, and what happened next, and there's no relationship with the client."  (Id. at 82).  He testified that he did this "to get us

back on track" and to "work through some of the difficulties in the testimony or, you know, make the ultimate decision you can't testify."  (Id. at 81-82).

He testified that even though the defendant had agreed not to testify, the possibility still existed that the defendant would change her mind and elect to testify.  (Hr. Tr. at 77).  He also testified that if she had changed her mind, he was prepared to conduct her direct examination, although it would not have been "perfect," given that the defendant, having agreed not to testify, did not participate in an extended preparation session over that final weekend.  (Id. at 83).  Mr. Bernstein testified that he spoke with the defendant on the morning of Monday, July 8, 2019 (the day the government and the defense rested and summations were given), and the defendant had not changed her mind about testifying.  (Id. at 77).  He testified that he spoke again with the defendant at the lunch break (prior to the defense's resting its case), but that the first time the defendant indicated to him that she wanted to testify was at some point during Mr. Schmidt's summation.  (Id.).  He testified that he did not advise the Court of the defendant's stated desire to testify because, among other reasons, in his view it was too late – a point he also communicated to the defendant.  (Id. at 79).

In addition to the testimony, the Court also admitted two exhibits into evidence at the Hearing.  The first was an email communication from Mr. Bernstein to the government dated July 5, 2019.  (Hr. Ex. 2).  In the email, Mr. Bernstein wrote to the government in response to an inquiry as to the likelihood of the defendant's testifying when the trial resumed: "[t]he most up to date and accurate answer is that 1) [Mr. Schmidt] and I are 100% certain we do not intend to put her on the stand[; and] 2) what percentage she is about not testifying, we don't know."

The second was another email from Mr. Berstein to the government dated July 7, 2019 that attached a picture of handwritten post-it note.  (Hr. Ex. 1A and 1B).  The subject line of the email was: "[Mr. Schmidt's chart as to probability that client testifies."  The post-it note contained a handwritten graph plotting the chances that the defendant would elect to testify over time.  The percentage chance of the defendant's testifying was depicted in the graph as "0" at "10:00 a.m.," rising to "100%" at "11:00 a.m.," and then falling back to "0" by "11:47 a.m."  The post-it note also noted a "?" with respect to "tomorrow," meaning July 8th, the day the trial was set to resume after the weekend break.  Mr. Schmidt – who testified that he created the handwritten graph – testified that:

> [B]ecause of the nature – because of who [the defendant] is and what she had said previously and how she has changed her mind that for tomorrow I did not want to leave it as she would not testify because there was always a possibility she would come in here and decide that she wanted to testify and that's why I put a question mark for tomorrow which would be Monday.

(Id. at 59).

II.  ARGUMENT

    A.  Trial Counsel Did Not Commit a Structural Error in Conceding Guilt to the Bank Fraud Counts Because the Defendant Had Agreed to the Strategy and Did Not Raise a Contemporaneous Objection

        1.  Relevant Law

It is well established that in accepting counsel, a defendant gives a significant amount of decision-making authority to counsel.  While the defendant retains authority over fundamental decisions within the case, counsel is granted the right to make strategic and tactical decisions that are based on reasonable professional judgement.  See Jones v. Barnes, 463 U.S. 745, 751 (1983); Strickland v. Washington, 466 U.S. 668, 690-91 (1984).  It is

generally accepted that the decision to concede guilt is a fundamental right granted to the defendant.  McCoy v. Louisiana, 238 S. Ct. 1500, 1509 (2018) ("When a client expressly asserts that the objective of 'his defence' is to maintain innocence of the charged criminal acts, his lawyer must abide by that objective and may not override it by conceding guilt."). When a defendant expressly objects to the concession of their guilt to any charges and remains steadfast in their desire to maintain their innocence, counsel has a duty to respect this decision and if counsel concedes guilt over the clear objection of their client, then counsel has committed a structural error, violating a defendant's fundamental rights. McCoy, 238 S. Ct. at 1511.

However, the decision to concede guilt to certain charges to obtain acquittal or more lenient sentences is a strategic decision retained by counsel in situations where the defendant does not object to this proposed course.  See Florida v. Nixon, 543 U.S. 175, 178 (2004) ("[W]hen a defendant, informed by counsel, neither consents nor objects to the course counsel describes as the most promising means to avert a sentence of death, counsel is not automatically barred from pursuing that course."); McCoy, 238 S. Ct. at 1509 ("If a client declines to participate in his defense, then an attorney may permissibly guide the defense pursuant to the strategy she believes to be in the defendant's best interest.").  The burden of proof lies with the defendant, who must show an objection on the record to the proposed concessions or show "not only that [the defendant] disagreed with counsel, but that [the defendant's] will was overborne by his counsel."  John v. New York, 2013 U.S. Dist. LEXIS 168977, at *40 (S.D.N.Y. 2013) (explaining to meet the burden of showing the defendant did not acquiesce "in the strategic judgement of his trial judge," the petitioner "must show that

he in fact objected, and a petitioner who does not state an objection on the record must show not only that he disagreed with counsel, but that his will was overborne by his counsel.").

    2.   <u>Analysis</u>

Here, the trial and Hearing record shows that the defendant consented to the strategy of conceding her guilt to the Bank Fraud Counts.  There is no dispute that prior to trial the defendant had authorized trial counsel to attempt to secure a guilty plea to the Bank Fraud Counts in order to resolve the entire case against her.  <u>See</u> Hr. Tr. at 7 ("I did authorize them to negotiate a plea deal and the negotiating the plea deal would actually be the concession"); <u>id.</u> at 18 ("So I did authorize them to negotiate and for the guilty plea for these two counts and other five counts, like dismiss for the other five counts.").  Accordingly, there is no dispute that the defendant was prepared to admit guilt to the Bank Fraud Counts in the context of a guilty plea and that she discussed doing so with her attorneys.

Trial counsel testified that after plea negotiations had failed, the defendant and trial counsel continued to discuss her conceding guilt to the Bank Fraud Counts as part of trial strategy.  As described above, the strategy was not simply to offer a blanket concession from the outset of trial.  Rather it was to admit certain indisputable facts in the opening statement (e.g., that Taha and Bailey were not the defendant's cousins as falsely claimed in the gift letters), see how the trial evidence came in, and, if necessary, offer a more fulsome concession in the closing argument.  Ultimately, trial counsel elected (in consultation with the defendant) to make the more fulsome concession because, as trial counsel testified, the evidence as to the Bank Fraud Counts was overwhelming (including, among other things, a second mortgage that the defendant had obtained and deliberately concealed from New Penn, but that nonetheless been recorded in the county clerk's office).  As conceived, the

concession would allow the defense to maintain credibility in arguing that, while the defendant may have lied to New Penn to obtain a mortgage, she would not, under any circumstance, steal from the non-profit organization that she had founded and led for many years.  Both Mr. Schmidt and Mr. Bernstein testified that the strategy (and its evolution) was discussed with the defendant, who agreed to it.

   As described above, the record supports counsel's testimony on this point. Trial counsel previewed the strategy of conceding guilt to the Bank Fraud Counts for the Court in a motion in limine prior to the start of trial; reiterated it in another mid-trial filing opposing a motion in limine from the government; and described it in greater detail in on-the-record discussions with the Court (in the presence of the defendant) on at least two occasions during the course of the trial.  The notion that experienced defense counsel would have undertaken this course – including unequivocally announcing the strategy to the Court in filings and oral arguments – without client approval strains credulity to the breaking point. At a minimum, the record shows that the defendant failed to register any objection (on the record or otherwise) to counsel indicating that they did not have her authority to proceed.  As described above, in the absence of such objection, the defendant's attorneys were free to pursue the strategy as a matter of discretion.[8]

   Though the defendant argues that the concession was against her stated preference and therefore a structural error, it should be noted that, even if the Court were to

---

[8]  In claiming that she did not consent to the strategy, the defendant claims that trial counsel told her that she had a "very strong defense" to the Bank Fraud Counts.  (Hr. Tr. at 20).  The defendant failed to articulate in any credible way what the "very strong defense" would have been, and her claim flies in the face of the trial evidence, the Hearing record, and common sense.

consider whether the concession was reasonable under <u>Strickland</u>, the record shows that it plainly was. As noted above, the evidence in support the Bank Fraud Counts was overwhelming. Further, counsel testified that they believed that a conviction on the Bank Fraud Counts would have carried minimal exposure under the United States Sentencing Guidelines ("U.S.S.G" or the "Guidelines"). (Hr. Tr. at 56, 66).[9]

      B.    <u>Trial Counsel Properly Advised the Defendant on the Question Whether to Testify in Her Own Defense and Did Not Prevent Her from Doing So Had She So Chosen</u>

           1.    <u>Relevant Law</u>

It is well established that

> [a] defendant's right to testify in his own defense is personal and
> may not be waived by his attorney over the defendant's
> opposition, regardless of tactical considerations. . . . Defense
> counsel is obligated to inform the defendant of the nature and

---

[9]      The offense level under the Guidelines for a bank fraud charge is governed by § 2B1.1. Application Note 3(E)(iii) to U.S.S.G. § 2B1.1 says that the "loss" for a mortgage fraud crime should be reduced by, "the fair market value of the collateral as of the date on which the guilt of the defendant has been established . . . ." Application Note 3D(i) provided that "[l]oss shall not include . . . [i]nterest of any kind, finance charges, late fees, penalties . . . or other similar costs." Based on recent discussions with current counsel, the government understands that the defendant owes approximately $975,000 in principal on the mortgage loan that was the subject of the Bank Fraud Counts (the defendant also owes approximately $224,000 in interest plus another approximately $404,000 in "Funds Owed by Borrower," but it is unclear whether these figures would be included in any "loss" calculation based on Application Note 3D(i)). The current estimate of the property's fair market value according to zillow.com is approximately $1.9 million to $2 million. Thus, trial counsel could reasonably have believed that the value of the property (even at the time of conviction) would have exceeded the outstanding loan amount, thereby creating a loss of zero under § 2B1.1. That would produce an offense level of 7 (the base offense level for bank fraud), which would in turn produce a Guidelines range of 0-6 months if the defendant fell within Criminal History Category I. Under these circumstances, the strategic choice to concede guilt on the Bank Fraud Counts was sound in light of the prohibitive evidence of guilt and the comparatively low Guidelines range that trial counsel understood to be the likely result of conviction on those Counts.

existence of his right to testify and fails to meet that obligation
either by failing to inform the defendant of the right to testify or
by overriding the defendant's desire to testify[.]

Celaj v. United States, 516 F. Supp. 3d 351, 364 (S.D.N.Y. 2021) (internal quotation marks

and citations omitted).

The defendant contends that the right to testify is so fundamental that

interference with it amounts to "structural error," which eliminates – when raised post-trial or

on direct appeal – the need for the defendant to establish prejudice under the traditional

Strickland analysis of ineffective-assistance-of-counsel claims.  See Yannai v. United States,

346 F. Supp. 3d 336, 346-47 (E.D.N.Y. 2018) (Korman, J.).  That the denial of the right to

testify is a "structural error" does not change the fact that "courts are entitled to presume,

unless the defendant can overcome the presumption, that defense counsel was effective and

did not fail to advise the defendant of his right to testify."  United States v. Montilla, 85 Fed.

Appx. 227, 230 (2d Cir. 2003); see also Celaj, 516 F. Supp. 3d at 364 ("[A]s any non-

testifying defendant can claim that he was denied his right to testify after trial, a defendant

bears the burden of proving his claim with detailed allegations."  (internal quotation marks

and citations omitted)).  Because the defendant has not established that her trial counsel in

fact prevented her from exercising her right to testify in her own defense, the question

whether any such prevention resulted in prejudice (even if legally required) need not be

reached.

        2.   Analysis

The defendant does not claim that she did not know she had the right to testify.

Nor does she claim that trial counsel failed to tell her that the decision whether to testify was

hers.  See Hr. Tr. at 34 ("Q:  Did they tell you that the decision [not to testify] was yours?

A: Absolutely.  Absolutely.").[10]  Rather, the defendant claims that she disagreed with trial counsel's assessment that her testifying would be "legal suicide" and that she repeatedly told them she wanted to testify, but counsel refused to implement her instruction.  Trial counsel testified that the defendant at times expressed a desire to testify, and the record is clear that trial counsel strongly considered calling her as a witness in her own defense – but, in the end, counsel concluded it would be contrary to the defendant's interests to take the stand and, after some indisputably contentious debate, the defendant agreed with this assessment.

It is clear that the defendant regrets the decision not to testify, but that is not enough to establish a "structural error."  To carry her burden, the defendant must show that counsel somehow managed to thwart her clearly expressed intentions.  The record here, as developed at the trial and the Hearing, establishes that the defendant's unequivocal desire to testify materialized only in hindsight.  See United States v. Noorzai, 953 F. Supp. 2d 499, (S.D.N.Y. 2013) (declining to credit "self-serving, conclusory" statements by defendant in affidavit that trial counsel ignored his requests to testify or advised that he was not permitted to testify).

The defendant suggests that she kept her decision to testify from her trial counsel, believing that the Court would ask her before the end of the trial whether she wished to testify and, at that point, she could elect to testify.  But when pressed as to why she did not at any point speak up and inform the Court that she wanted to testify, the defendant's only

---

[10]    Trial counsel's contemporaneous communications to the government (Hr. Ex. 1A, 1B, and 2) communicate counsel's belief that the defendant understood that she was to make the final decision about whether to testify, as evidenced by counsel's clearly conveying to the government the possibility that the defendant might overrule their advice and elect at the eleventh hour to take the stand.

response was that she did not "know that much about this legal proceeding or the process" and "a lot of things happened so fast in the courtroom."  (Hr. Tr. at 28-29).  This answer is wholly inadequate to explain why the defendant remained silent while (1) the government rested its case; (2) her trial counsel called two defense witness and read several stipulations; and (3) the parties took an hourlong lunch break before the defense rested its case and summations began.  See Drivas v. United States, 10-CR-771 (NG), 2017 WL 5028065, *5 (E.D.N.Y. Oct. 31, 2017) ("[The defendant] did not say or do anything during the trial that indicated to me that he wished to testify but was being denied the opportunity.  It is reasonable to assume that, had [the defendant] wanted to testify, and had his counsel rested his case over his objection, [the defendant] would have voiced an objection at that time, or at least requested to speak to his attorney.  [The defendant] did not do so.").

        The Court should not countenance the defendant's claim, which defies the record and common sense.  The defendant is college-educated, has taken graduate courses at New York University, and attended Harvard University's executive MBA program.  She was the head of a non-profit organization that employed nearly 500 employees and received more than $20 million a year in federal funds.  She described herself as a "very strong advocate for her constituents."  She is not a stranger to the court system – she commenced divorce proceedings in state court, she has sued Human First for wrongful termination, and she filed an appeal in this court when the Social Security Administration denied her disability benefits.  Put simply, the defendant knows how and when to assert herself.  Yet, the defendant would have this Court believe that after waiting for three years to have her day in Court and foregoing her right to testify at her state court tax trial so as not to compromise her chances at what she considered to be a more serious federal trial, she sat on her hands and did nothing

29

while this most critical opportunity passed her by.  In the end, the Court should see the

defendant's claim for what it is – a last-ditch effort to duck the jury's verdict.

<u>CONCLUSION</u>

For the reasons stated above, the defendant's motion for a new trial should be

denied.

Dated:      Brooklyn, New York
                April 29, 2022

                                                  Respectfully submitted,

                                                  BREON PEACE
                                                  UNITED STATES ATTORNEY
                                                  Eastern District of New York
                                                  271-A Cadman Plaza East
                                                  Brooklyn, New York 11201


                                  By:      _____/s/_____
                                                  Robert T. Polemeni
                                                  F. Turner Buford
                                                  Assistant United States Attorneys
                                                  (718) 254-7000

30